**Robert J. SMITH and Kazuko Smith, Plaintiffs-Appellants,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant-Appellee.**

**No. 71–3185.**

United States Court of Appeals, Fifth Circuit.

July 25, 1972.

Rehearing and Rehearing En Banc Denied Aug. 29, 1972.

Mark Z. Levbarg, Mack Kidd, Herrington, Levbarg & Weeks, Austin, Tex., for plaintiffs-appellants.

John Coates, Mary Joe Carroll, Clark, Thomas, Harris, Denius & Winters, Austin, Tex., for defendant-appellee.

Before GOLDBERG, DYER and SIMPSON, Circuit Judges.

DYER, Circuit Judge:

The Smiths, having obtained a judgment against Sandra Wolf for personal injuries suffered by them as a result of an automobile collision, sued Allstate, who insured Sandra's father, claiming that his policy covered Sandra while she was driving a non-owned automobile which she had purchased but for which no certificate of title had been issued to her. The district court granted summary judgment in favor of Allstate. We affirm.

On April 12, 1969, Sandra Wolf, a 19-year old student at the University of Texas, purchased a used automobile from the Austin Motor Company. She paid cash for the automobile and took possession of it. On the following day she struck and injured two pedestrians, appellants Robert Smith and his wife. While Sandra had signed an application for a certificate of title at the time of the purchase and payment for the automobile, the certificate was not delivered to her until after the accident had occurred. In the interim record title remained in the name of the prior owner of the vehicle, Schnell, for whom Austin resold the automobile in lieu of repossession proceedings.

The evidence submitted by Allstate in support of its motion for summary judgment, uncontroverted by the Smiths, reveals that in May, 1968, Simmons, the owner of Austin, had sold the automobile involved to Schnell under an installment note. In November of that year Schnell defaulted in payment and shortly thereafter brought the automobile back to Simmons and verbally authorized him to sell it for the balance due on the note. The contract of sale between Austin and Schnell contained the usual provision granting the seller (Austin) the right of repossession and resale upon default.

A certificate of title would have been issued to Sandra if Simmons had filed Schnell's certificate of title showing the lien of Austin on the car, the title application signed by Sandra, and a repossession affidavit executed on behalf of Austin. As a favor to Schnell, however, Simmons chose not to treat the transaction with Schnell as a repossession but, with Schnell's consent, to simply advise him of the resale and then secure his power of attorney authorizing Austin to sell the automobile, and at that time obtain Schnell's certificate of title.

Following the accident the Smiths filed suit in state court for their personal injuries and recovered judgment against Sandra for $150,000. After entry of the judgment, the Smiths instituted this diversity action against Allstate to enforce the state court judgment against the company, alleging that Sandra was insured by Allstate at the time of the accident under the family liability policy issued to her father in Bismarck, North

Dakota. The Smiths alleged that Sandra, as an undisputed legal resident of her father's North Dakota household, was covered by the family policy because at the time of the collision, either she was a resident relative driving a "non-owned" automobile, or, in the alternative, if it was determined that she acquired an ownership interest in the vehicle, that she did so as an agent of her father, and was therefore driving an automobile owned by him. In the policy issued to her father, the named insured is covered with respect to automobiles owned by him, any resident of his household is covered with respect to the owned automobiles, and any relative who is a resident of the insured's household is covered with respect to a non-owned automobile not regularly furnished for use of such relative. The Smiths assert that Sandra did not own the automobile because the failure of Austin to deliver to Sandra a certificate of title violated the Texas Certificate of Title Act, Vernon's Texas Penal Code Ann. art. 1436–1 et seq., which by its provisions renders such a sale void. Allstate counters that under Texas law, in the context of this case, a technical failure to comply with the Act did not affect the validity of the transfer of ownership of the automobile to Sandra, and therefore she was not driving a "non-owned" automobile. Allstate concedes that the Act has not been complied with by Schnell, Simmons, and Wolf, the parties to the transaction.

*In limine,* we are convinced that there is no factual dispute with respect to the ownership of the car driven by Sandra Wolf. The pleadings, depositions, and affidavits attached to Allstate's motion for summary judgment show without contradiction that Sandra paid cash to Austin for the automobile, that the payment was from money she had earned or saved, that Austin delivered the car to her on the day of purchase, that a contract of sale was signed, that she signed an application for certificate of title, and that she had done everything required of her to complete the purchase of the automobile. She was convinced that she

had bought the car. Simmons, the owner of Austin, considered the sale consummated. Schnell considered the matter closed. There was simply overwhelming, uncontradicted proof by Allstate that no controversy concerning the ownership of the car existed among any of the real parties in interest at the time the collision occurred.

Since the Smiths offered nothing to controvert the factual showing made by Allstate in support of its motion for summary judgment, Allstate must prevail if the judgment was appropriate as a matter of law. Fed.R.Civ.P. 56(e). *See* First National Bank of Arizona v. Cities Service Co., 1968, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569; Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co., 5 Cir. 1972, 455 F. 2d 957. Undoubtedly in some cases the question of automobile ownership may be both factual and legal requiring submission to the jury of the factual issue. American Employers' Insurance Co. v. Zablosky, 5 Cir. 1961, 292 F.2d 412, cert. denied 368 U.S. 946, 82 S.Ct. 387, 7 L.Ed.2d 343. But here, the only contested issue is the legal effect of the Texas Certificate of Title Act upon the transfer in question which is, of course, inappropriate for jury consideration.

The Smiths argue that under no circumstances does the purchaser get ownership, title, or right to title of an automobile *vis-a-vis* the record title owner unless and until there is compliance with the provisions of the Certificate of Title Act. We disagree. It is clear under Texas law that non-compliance with the Act does not override the clear showing of a valid and complete transfer of ownership of the automobile to Sandra Wolf. In Texas, automobile ownership, in the factual context of this case, is not dependent upon who holds the certificate of title. While the Act defines an owner of a motor vehicle for certain purposes, "the statutory definition is not a comprehensive pronouncement applicable under all circumstances." Strickland Transportation Co. v. Ingram, Tex.Civ.App.

1966, 403 S.W.2d 192, 194 (writ dism'd). "The legislative intent as disclosed in section 1 of the Certificate of Title Act, was to lessen and prevent theft and traffic in stolen motor vehicles . . . ., and not to prevent sales and transfers of interest in motor vehicles." Hicksbaugh Lumber Co. v. Fidelity and Casualty Company of New York, Tex.Civ.App. 1944, 177 S.W.2d 802. *Accord,* Johnson v. Safeco Insurance Co., Tex.Civ.App. 1971, 464 S.W.2d 164, 169.

■ ■ A certificate of title in the name of one other than the person in possession of an automobile raises a presumption of ownership in favor of the title holder. "Such presumption is not evidence under Texas law but is an 'administrative presumption' which merely requires the person against whom the presumption is asserted to produce evidence to the contrary. If clear, positive and undisputed evidence to the contrary is introduced then the presumption, as the Texas courts state, 'vanishes' or 'is put to flight.'" American Employers' Insurance Co. v. Zablosky, *supra,* 292 F. 2d at 414 (Citations omitted). Furthermore, a sale of an automobile without the transfer of a title certificate is valid as between the parties, when the purposes of the Certificate of Title Act are not defeated, although the Act declares that the non-transfer of such certificates renders the sale void. Rush v. Smitherman, Tex.Civ.App.1956, 294 S.W. 2d 873, 877 (writ ref'd); *see* Phil Phillips Ford, Inc. v. St. Paul Fire and Marine Ins. Co., Tex.1971, 465 S.W.2d 933, 937; Hicksbaugh Lumber Co. v. Fidelity & Casualty Company of New York, *supra.* *See also* Viator v. American General Insurance Co., Tex.Civ. App.1967, 411 S.W.2d 762 (writ ref'd n.r.e.), where, in a strikingly parallel situation, the sale of an automobile was held valid and ownership was held to have passed for insurance purposes even though there had been no transfer of the title certificate at the time of the accident.

■ The unusual twist in this case is that there is no dispute between the persons who have claimed or ever had an interest in the automobile. All of them recognize the transaction as a valid sale to Sandra. Only the injured parties urge the absence of compliance with the Act as a basis for recovery from the carrier of Sandra's father's liability insurance. They are in no position to do so. Both Truck Insurance Exchange v. Schuenermann, Tex.Civ.App.1965, 391 S.W.2d 130 (writ ref'd n.r.e.), and Johnson v. Safeco Insurance Co., *supra,* involved the question of insurance coverage in instances where there was a transfer of an automobile but the title certificate was not changed until after an accident. In *Schuenermann* the automobile being driven by Rauel Diaz at the time of the accident was purchased by his father Marcos in 1957 and the title certificate was in his name. In 1959, Marcos gave the automobile to Rauel as a graduation present indicating that the son would have title to it. Rauel had possession of the automobile at all times until the date of the collision in 1962, but the title certificate had never been transferred to him nor any application made by him for a new title. It was contended that Rauel was a non-owner and thus covered under his father's policy. The court held that the insurance company was not obligated to defend and was not liable under the policy, saying:

> This case does not involve a dispute between rival claimants of an interest in the automobile in question. Under such circumstances, the administrative presumption of ownership arising from the recitals in the certificate of title may be overcome by evidence showing that ownership of the vehicle was, in fact, in Rauel Diaz . . . . The evidence and stipulations establish that, in fact Rauel Diaz was the owner of the 1953 Ford. Since all parties concede that in such event the appellant insurer is under no obligation to defend or indemnify the estate of the insured, it follows that the trial court erred in holding that there was coverage under the "non-owner" policy.

*Id.* at 133–34.

In *Johnson* Mr. Smith of Colorado, in February of 1967, gave to his daughter Mrs. Brown, a 1960 Chevrolet. On November 30, 1967, Smith executed and mailed to Mrs. Brown, who was a resident of Texas, an assignment of the Colorado title. On December 14, 1967, Mrs. Brown was involved in an accident with Mrs. Johnson whose minor son was injured. Prior to the accident a certificate of title had not been issued in Mrs. Brown's name. The Johnsons obtained a judgment against Mrs. Brown and then sued Safeco Insurance Company who carried automobile liability on the car while it was owned by Mr. Smith, claiming that the automobile was still owned by him because of the admitted non-compliance with the Texas Certificate of Title Act. The court denied recovery, saying:

> This case does not involve a dispute between persons claiming title to the car. Under such circumstances, the administrative presumption of ownership existing from the recitals on the certificate may be overcome by the evidence showing ownership. The Colorado certificate of title had been executed, assigned and delivered to Mrs. Brown, together with the possession and use of the automobile. Mrs. Brown had received and accepted them, and subsequently made application for a Texas title. The intent of the parties was apparent.

*Id.* 464 S.W.2d at 170.

We think it is clear that in this case the Smiths may not utilize the Texas Certificate of Title Act to fasten liability on the insurance company as a defendant.

Finally, the Smiths argue that in contrast to a two party transaction, "in a three party transaction, the prospective purchaser does not take title until all of the formalities of the Certificate of Title Act have been complied with." They support this abstract statement with reliance upon Freeberg v. Securities Investment Co., Tex.Civ.App.1960, 331 S.W.2d 825 (writ ref'd); Guinn v. Lokey, 1952, 151 Tex. 260, 249 S.W.2d

185, and Phil Phillips Ford, Inc. v. St. Paul Fire and Marine Ins. Co., *supra.* In the context of the case *sub judice*, their reliance upon these authorities is misplaced.

In *Freeberg* and *Guinn* non-compliance with the Act was relied upon *by the record title holder* as a basis for recovery after he had been *defrauded* by another person who had come into possession of the automobile. In *Phil Phillips Ford*, again the Act was invoked to protect a bona fide lienholder from one who attempted to sell the automobile for full value and thus defeat the lien. These cases are clearly inapposite to this case where there are no conflicting claims as to ownership or rights of a claimed bona fide purchaser for value and a defrauded seller.

In summary, we agree with the district court that ownership of the automobile driven by Sandra at the time of the Smith's injury was vested in her. She was therefore not driving a "non-owned" automobile within the provisions of her father's policy with Allstate. The Smiths' injury was vested in her. She purchased the car as an agent for her father, and was therefore driving a car "owned" by him and covered under the policy is wholly without merit. The judgment of the district court is

Affirmed.

SIMPSON, Circuit Judge (dissenting):

With deference, I dissent. I think that summary judgment was improvidently granted below in favor of Allstate Insurance Company.

Mr. and Mrs. Smith suffered personal injuries to an extent assessed by a State Court jury at $150,000. These injuries were caused when the Smiths, pedestrians at the time, were struck by a Ford Thunderbird automobile driven by Sandra Wolf, a 19 year old University of Texas co-ed, and concededly a permanent North Dakota resident. If Sandra Wolf was (1) a resident member of her father's Bismarck, North Dakota, household, temporarily sojourning in Texas,

and if (2) the Ford Thunderbird was a non-owned car not regularly furnished for her use, then, under her father's Allstate Insurance Company liability policy, Allstate owed a duty to defend the State Court suit and to pay the Smith's judgment. Allstate did neither.

Determination of the ownership or non-ownership of the Thunderbird by Sandra Wolf at the time the accident occurred required resolution of factual disputes, not simply questions of law. These were for a jury, not a court, on summary judgment motion, to decide. The trial court and the majority of the panel as well equate Sandra's taking physical possession of the Thunderbird from Steve Simmons on April 12, 1969 (the day before the accident) with her becoming its owner on that day. Terry Schnell had redelivered physical possession of the car to the president of Austin Motor Company, Steve Simmons, under an oral agreement that he would sell the car in return for extinguishment of the lien balance Schnell then owed Austin for the car. Steve Simmons had the legal right to handle this as a repossession by filing a written repossession affidavit, but deliberately chose not to do so. Had this occurred, title could have been delivered by Austin to Sandra Wolf. Sandra paid Steve Simmons $325.00 cash and departed with the car. The injury to the Smiths occurred the following day.

On April 12 Steve Simmons had no power or authority to convey ownership of the Thunderbird, because under the Texas Certificate of Title Act, ownership can be conveyed only pursuant to written authority in the form of a written power of attorney or written assignment of the certificate of title.[1] See Texas Certificate of Title Act, Sections 33, 40 and 53.[2] Section 53 provides that sales made in violation of the act shall be void and no title shall pass until the provisions of the act have been complied with. Admittedly, ownership and title are not necessarily the same under Texas cases, but ownership is at least presumptively established by title. At best, on April 12, Steve Simmons had naked possession of the car with an oral promise from Schnell to convey title, but this was a question of fact to be demonstrated on proof. It was not until May 2, 1969, that Simmons was authorized to convey ownership of Schnell's vehicle. Authorization came only after bargaining between Simmons and Schnell on that date.

The Texas cases as I understand them hold that under these and similar circumstances ownership is a question of fact to be passed upon by a jury, not a matter to be disposed of by summary judgment. See, e. g., Phil Phillips Ford, Inc. v. St. Paul Fire and Marine Ins. Co., Tex.1971, 465 S.W.2d 933; Freeberg v. Securities Inv. Co. of St. Louis (Tex. Civ.App., San Antonio, 1960, writ ref'd.) 331 S.W.2d 825; Guinn v. Lokey, Tex. 1952, 249 S.W.2d 185.[3]

1. Absent the filing of a repossession affidavit.

2. Article 1436–1 et seq., Vernon's Texas Penal Code. Appellant's brief also cites Section 52, but my research indicates that this section was repealed by the Texas Legislature in 1967. This is immaterial from the standpoint of appellant's right to a reversal.

3. In *Phillips Ford, Inc.*, one Dignan attempted to transfer ownership of a car to Phillips Ford, Inc. and gave that dealer a written power of attorney to transfer the certificate of title. The original title was held by a lienholder and so could not be assigned by Dignan. In holding that no ownership rights passed to Phillips Ford, Inc. and that the sale was void, the Texas Supreme Court observed:

"Dignan gave Phillips his power of attorney and certainly Phillips had the right to take all necessary steps to comply with the statute and transfer the certificate of title from Dignan to Ford or another. See, Freeberg v. Securities Investment Co., 331 S.W.2d 825 (Tex.Civ.App.1960, writ ref.). The certificate of title is in this record, and it shows that Phillips did not exercise his power and took none of the steps necessary to effect a transfer.

"As to SIC, Dignan's sale to Ford was void. Art. 1436–1, Sec. 53, Vernon's Ann.Penal Code; Ballard v. As-

I am persuaded that a jury could properly find in the present case that Terry Schnell was the owner of the Ford Thunderbird on April 12, 1969. He had never assigned the title to any dealer or individual. He signed no power of attorney for Simmons to sell his car until May 2, 1969, and then only on condition that his alleged indebtedness to Simmons be cancelled. Simmons had neither ownership nor title, merely naked possession, to convey on April 12, 1969 when he delivered the Thunderbird to Sandra Lynn Wolf. Summary judgment was not warranted in this case.

There is another theory postulated by the appellant which would also require factual findings by a jury. If it is determined by a jury (or by the court, as was done below and as the majority approves) that ownership of the Thunderbird actually passed to Sandra Lynn Wolf, the evidence may well justify a jury determination that Sandra Lynn acquired ownership as agent for her father, and that the Thunderbird thereby became an *owned* vehicle covered under his policy with Allstate.[4]

Miss Wolf's deposition testimony with respect to the source of the money used to pay Steve Simmons for the Ford Thunderbird was as follows:

"Q. Where had that money come from, Miss Wolf?

A. Partially from my earnings as a cocktail waitress, partially my mother had sent me periodically small sums that she was able to send me; because of the large family she doesn't have much money, but she sent what she could.

Q. All right. And would it be a fair statement that before the collision of April 13, 1969, you had had discussions with your parents about buying a car?

A. Yes, I had talked of the possibility.

Q. All right. And of course since . . .

A. This was by letters.

Q. Since you only possessed the Thunderbird for approximately one day—and I will get to that in just a moment—but you had discussed with them the possibility of just buying a car?

A. Yes.

sociates Investment Co., 368 S.W.2d 232 (Tex.Civ.App.1963, writ ref. n.r.e.). Ford at no time acquired title to the automobile, and title was still in Dignan at the time of the repossession."
The rules for determining ownership in a three-party transaction were set out by Justice Pope in *Freeberg* as follows:
"There may be a valid sale between the owner and purchaser though the certificate is not immediately delivered and while the papers are being processed, but those cases do not excuse the processing of papers indefinitely and do not countenance sales by non-owners.
"This is not the situation of a purchaser buying from an owner, followed by a temporary lapse of time before the papers are processed. To hold that a purchaser complies with the law by making a request for the certificate of title, whether the request is made of the owner or someone else who falsely poses as owner would make a ritual of and leave very little in the protective features of the Act."

*Guinn* involved another three-party transaction where the Texas Supreme Court held attempted sales of a motor vehicle *void* for failure to comply with the Texas Certificate of Title Act, stating:
"From the findings made, Wally Mahan did not comply with Sections 27, 33, 51, and 52 of Article 1436–1. Since Wally Mahan did not comply with the statute, he cannot be a bona fide purchaser, for he holds under an illegal contract of sale. * * * Section 51 required that Wally Mahan have 'in his possession the proper receipt or certificate of title covering the motor vehicle so offered.' Not having had this, the sale to J. A. Lokey was void under Section 53."

4. The majority give this theory short shrift indeed: "The Smiths' further contention that Sandra purchased the car as an agent for her father, and was therefore driving a car 'owned' by him and covered under the policy is wholly without merit." Page 108.

Q. You didn't specify a particular car that you were going to buy?

A. No.

Q. Is that a correct statement?

A. Yes.

Q. And did your parents seem to approve of the idea of your buying a car?

A. Yes.

Q. Did they know that it was going to be bought partially with the money that they had sent you, that you had saved?

A. Yes. That was mine, to do what I wanted to with.

Q. And, of course, you had been without transportation for over or right at two years, and this would aid you in getting to and from your job, is that correct?

A. Yes.

Q. And they understood?

A. Yes.

Q. I will ask you, Miss Wolf, to state whether or not it was your intention to notify your parents, upon purchase of the car, so that it would be carried on your All-state insurance policy?

A. Yes." (Sandra Lynn Wolf's deposition pages 14 and 15.)

It is thus indicated that her parents knew of the purchase beforehand and further that the car was a necessity in connection with her attendance at class and her work as a cocktail waitress. Her parents had sent money which was used in part to purchase the car and they had prospectively approved of its purchase. A proper subject for jury decision is whether or not the automobile was in fact a necessary for Sandra Lynn to earn income to help pay her way through college. If so the Thunderbird was an additional car acquired by her father, the named insured, if the factual determination eventually is that she acquired an ownership interest in the car. She and her parents notified Allstate within a few days of the purchase of the car.

The property right in articles purchased for or furnished to a minor child is presumptively held by the parent. Speer, Marital Rights in Texas, Section 126, and Miss Wolf's earnings were subject to her parents' control. Texas Family Code, Section 5.24, V.T.C.A. The parent is under a duty to support a minor child and to furnish necessaries for her. His failure to discharge this duty renders him liable to any person who provides necessaries to the minor child. Texas Family Code, Section 4.02, V.T.C.A. The obligation to provide necessaries for a child or wife is responsible for the Texas doctrine of an implied agency relationship of child or wife as agent for the parent or husband as principal, when the dependent's purchase is necessary. The theory is that the dependent purchasing a necessary merely provides herself with an item which the principal owed a legal obligation to provide. See, e. g., Daggett v. Neiman-Marcus Co., 348 S.W.2d 796 (Tex.Civ. App., Dallas 1961, no writ history); Crosby v. A. Harris & Co., 234 S.W. 127 (Tex.Civ.App., Dallas 1921, rehearing denied 1921); Gabel v. Blackburn Operating Corp., 442 S.W.2d 818 (Tex. Civ.App., Amarillo 1969, no writ history); Graham v. McCord, 384 S.W. 2d 897 (Tex.Civ.App.1964, rehearing denied 1964).

In *Daggett*, supra, Mrs. Daggett's $1959.90 balance to Neiman was found (as a matter of fact) to be for necessaries and the Dallas Court of Civil Appeals said: "We think the evidence warrants the presumed findings of the Court of implied agency (of wife for husband) . . .". In order to imply an agency relationship it must appear to the satisfaction of the *court and jury* that the articles are necessaries, that is reasonable and proper for the dependent. *Daggett*, supra.

The one hundred year old Texas case of Fowlkes v. Baker, 29 Tex. 135 (1867), is cited at 44 Tex.Jur.2d, page 97, for the proposition that the parent's liability may be established by showing the general practice of the child in pur-

chasing goods on the credit of the parent and the habit of the parent in paying therefor, and that a child's authority to bind his parent may be proved by showing the conduct or course of dealings of the parties in similar transactions. The following quotation from Fowlkes is instructive:

"The only portion of the charge assigned for error, is that in reference to what would be sufficient evidence of an authority given by a parent to a child to purchase necessaries for himself. The court instructed the jury on this point that, if the articles were necessaries, slight evidence would be sufficient; such as where the father knows of the purchase, and makes no dissent; or knows of the child's purchasing on credit, and does not within a reasonable time forbid further credit being extended to him; or where he sees the child wearing the clothes, or knows that he had received them, and made no objection." 29 Tex. at page 135.

Further, the Texas Supreme Court continued:

"The question, therefore, as to whether the articles purchased by the minor are necessaries or not becomes important only as it regulates the amount of evidence necessary to establish the father's liability. The authority of the parent to make the purchases must be proved in the one case, and in the other it is inferred, unless rebutted by circumstances showing that the parent had supplied the infant himself, or was ready to supply him. The charge of the court, then, so far as it decides that the father's authority to purchase necessaries might be inferred from slight evidence, is correct as an abstract principle of law. We think, also, that the circumstances mentioned in the charge are sufficient

to amount to the evidence required in such cases."

29 Tex. at pages 137–138.

To summarize, I think that the question of ownership was one for a jury, but that whatever the determination was with respect to ownership jury questions were present as to the coverage vel non of the Allstate policy issued to Miss Wolf's father. If she acquired ownership, as the majority is at pains to demonstrate, I think a jury should decide whether the car was a necessary, and if she acquired ownership as agent for her father. It was erroneous to dispose of the factual issues in this case by summary judgment.

I would reverse the judgment and remand for further proceedings below.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is Denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit, Rule 12) the Petition for Rehearing En Banc is Denied.

SIMPSON, Circuit Judge (dissenting):

On the grounds asserted in my dissent from the panel opinion, 467 F.2d 108, I respectfully dissent from the denial of rehearing by the panel.

I enter no objection to the lack of interest by members of the Court in seeking en banc rehearing, which I do not consider justified in this Texas diversity case. In such cases decisions of federal courts have relatively slight precedential importance.