**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bobbie Jean GUNTER and Virginia Thomas, Defendants–Appellants.**

No. 88–1075.

United States Court of Appeals, Fifth Circuit.

June 22, 1989.

---

4. A program authorized by the Comprehensive Employment Training Act, 29 U.S.C. § 801 *et seq.* (Supp. II 1978) (repealed 1982).

William R. Gustavson, Dallas, Tex. (court appointed), for Gunter.

Curtis Harden and James and Jame M. Murphy, Dallas, Tex. (court appointed), for Virginia Thomas and Virginia Thomas, pro se.

Louis Fischer, Atty. Dept. of Justice, Marvin Collins, U.S. Atty., and Lynn Hastings, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GARWOOD, JONES and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Bobbie Jean Gunter (Gunter) and Virginia Thomas (Thomas) were convicted in the district court of bank fraud in violation of 18 U.S.C. § 1344, making false statements to a bank in violation of 18 U.S.C. § 1014, and conspiracy to commit these offenses in violation of 18 U.S.C. § 371.[1] They assert on appeal that their convictions are not supported by sufficient evidence, that the district court improperly denied certain requested jury instructions, and that the court abused its discretion by striking the testimony of a defense witness who became unavailable for cross-examination after completing his direct testimony. We reject all of these challenges and affirm the convictions.

### Facts and Proceedings Below

Appellants, who were principal employees of Robert Gunter's two automobile dealerships when they committed the acts for which they were convicted, were tried for conspiring to defraud several banks through an elaborate scheme involving check kiting and pledging car titles that the dealerships no longer owned. Robert Gunter was president of the two Dallas-based, specialty car dealerships—Best Motors Company, Inc. (wholesale) and Road Show, Inc. (retail) (the companies). Appellants Gunter—Robert Gunter's mother—and Thomas—his sister—handled the companies' banking on a daily basis. Gunter was the secretary of these companies and was employed as title clerk. Thomas was first employed as a salesperson, then as a file clerk, and finally as Gunter's assistant.

Robert Gunter and the companies held lines of credit at several banks, including Dallas-based Texas American Bank (TAB) and Central National Bank (CNB), and Oklahoma-based Security State Bank (SSB). Two of these lines of credit—$450,000 at TAB and $200,000 at CNB—were secured by certificates of deposit and by automobile titles that under the terms of the relevant loan agreements (known as floor plans) were to represent inventory owned by the companies. Under the floor plan, as cars were sold to the public or other dealerships, the titles would be redeemed from the banks with a resulting reduction in the amount credited to Robert Gunter's and the companies' checking accounts, and as cars came into the companies' inventories, their titles would be transferred to the banks for a corresponding immediate credit in the checking accounts up to the established floor plan ceilings noted above.

As part of appellants' scheme, they redeemed car titles from these banks by writing checks on uncollected funds they had been advanced from the other banks. In order to conceal this, they used three to six banks in a continuous cycle of depositing checks and loan proceeds and issuing more checks on uncollected funds. From June through August 1986, appellants and Robert Gunter generated over $60 million in checks in a revolving cycle through the banks. The trial evidence clearly shows that appellants spent these months in a frenzied effort to cover large deficits—by writing checks from one bank to another—caused by the advancement and use of uncollected funds in the several accounts. Gunter oversaw the companies' transactions with TAB, and Thomas handled those with CNB. The operation collapsed in August 1986 when one bank stopped extending the companies immediate credit on uncollected funds and this resulted in large overdrafts at several banks.

After a jury trial, appellants were convicted on six counts of bank fraud in violation of 18 U.S.C. § 1344 (Counts 2 through 7); six counts of making false statements to a lending institution in violation of 18 U.S.C. § 1014 (Counts 8 through 13); and one count of conspiring to commit those offenses in violation of 18 U.S.C. § 371 (Count 1). Counts 2 through 13 are based on the presentment as collateral of individual certificates of title for cars that neither appellants nor the companies owned.

1. Robert Gunter, the third co-defendant in appellants' trial, was also convicted but is not joined in this appeal.

These counts do not assert that the check kiting aspect of appellants' scheme constituted either a material false statement knowingly made for the purpose of influencing a federally insured bank in violation of section 1014, or a fraud against a bank in violation of section 1344(a)(2), though Count 1 does describe the check kiting as part of the conspiracy for which appellants were convicted. Thomas and Robert Gunter admitted at trial that they knew that under the terms of their floor plan loan agreements with TAB and CNB the companies were supposed to own the cars whose titles they pledged, but claimed that they did not realize that some of the titles they pledged were for cars they had already sold. On appeal, appellants make the further argument that under Texas law, when appellants presented them with car titles, the banks received senior liens on even the cars appellants had already sold. Thus, they argue that nothing about the transactions was false or constituted fraud. We reject these arguments in affirming the lower court's convictions.

## Discussion

### Sufficiency of the evidence

Appellants attack their convictions by arguing that there was insufficient evidence of their bank fraud, that the bank fraud statute does not reach their conduct, and that their submission of car titles did not violate 18 U.S.C. § 1014 because this act did not constitute a statement, was not false, and was not done knowingly.

■ First, with respect to their convictions on the section 1344 bank fraud counts (2 through 7),[2] appellants argue that the government presented insufficient evidence that the companies lacked funds at any given time to cover the checks appellants wrote. Their primary argument, however, is that they were wrongly convicted because a fraudulent scheme involving a ser-

ies of kited checks does not constitute fraud by misrepresentation within the statute's meaning. *Cf. Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982) (holding that a check is not a statement for purposes of section 1014); *United States v. Frankel*, 721 F.2d 917 (3d Cir.1983) (ruling that a check is not a statement under the mail fraud statute, 18 U.S.C. § 1341). From the indictment and jury charge, however, it is clear that Counts 2 through 7 rest not on a check kiting scheme, but rather on the practice of pledging automobile titles for cars the companies had already sold to third persons. It was unnecessary, then, for the government to prove that the companies lacked funds to honor any particular check that was part of the scheme.

Courts have distinguished car title cases from the Supreme Court's *Williams* holding pertaining to check kiting. *See, e.g., United States v. Swearingen*, 858 F.2d 1555, 1556–58 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1540, 103 L.Ed.2d 844 (1989); *United States v. Bonnette*, 781 F.2d 357, 365 (4th Cir.1986). A check does not carry any express representation about the drawer's account balance, but the back of an automobile certificate of title lists the last transferor and is signed by the last transferee, thereby expressly representing the identity of the car's current owner. *Cf. United States v. McClelland*, 868 F.2d 704, 709 (5th Cir.1989) (holding that copies of forged sales tax returns presented to a bank to obtain a loan constituted a false representation satisfying 18 U.S.C. § 1344). That appellants represented, or stated, that they or the companies owned the cars whose titles they pledged is also reflected by their practice of including the companies' power of attorney with each title delivered, implying that one of the companies was the last transferee and that the bank could therefore use the power of attorney to further transfer the title.

---

**2.** This statute reads in relevant part:

"(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

"....

"(2) to obtain any of the moneys, funds, credits, assets, securities or other property

owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations or promises, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Appellants argue next that they did not violate section 1014 [3] because any representation or statement they may have made to the banks was not false. They base this contention on the assertion that under Texas law the banks had a priority security interest in the cars represented by the titles.[4] Thus, appellants contend that when they presented the car titles to the banks they represented only that the banks had a senior lien on the cars,[5] which allegedly was not a false statement. Appellants do not dispute that they pledged the titles to several cars that they had already sold to third parties, some of them several months before being pledged.

■ Although there is no evidence that appellants expressly confirmed the companies' ownership when they presented the car titles at the banks, we find sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that the parties —appellants and the banks—understood that appellants' presentation of the titles at the banks in connection with their floor plan arrangement constituted an assertion that the companies owned the cars represented by those titles. The loan documents detailing the companies' floor plan with CNB—one dated February 6, 1986, and signed by Robert Gunter, and the other dated August 7, 1986, and signed by both Robert Gunter and Thomas—stated that the companies would pledge titles for "in-

ventory of new and used automobiles, trucks, tractors, and other motor vehicles, together with all motor vehicles parts, motors, engines, bodies, accessories, equipment and the like, including items used or which may be used as demonstrator's service trucks, service equipment or otherwise, now or hereafter owned, possessed or acquired by the debtor." Similarly, the security agreement that Robert Gunter signed on October 26, 1985, to induce TAB to floor plan the companies' inventories, stated under Section II, entitled "Debtor's Representations and Warranties," that the collateral pledged ("various car titles") "is presently owned by Debtor." As discussed above, the titles themselves listed the last transferee on the back, and were allegedly signed by the last transferor. And these titles, all inaccurately listing one of the companies as the last transferee, were often accompanied by a power of attorney stating that the bank could sign the title over from one of the companies. If one of the companies did not own the car, this power of attorney would have been unnecessary and useless.

In addition, loan officers from both banks testified at trial that the banks understood that the car titles appellants pledged to them represented current rather than past inventory of the companies, and that the banks would not have been willing

**3.** Section 1014 reads in relevant part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any ... advance ... by ... the acceptance ... of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

**4.** Texas courts have held that bona fide car sales are valid as between buyer and seller even when the provisions of the Texas Certificate of Title Act, Tex.Rev.Civ.Stat. art. 6687-1 (Vernon 1977), which requires the transfer of the certificate of title when a vehicle is sold, have not been complied with. See, e.g., Najarian v. David Taylor Cadillac, 705 S.W.2d 809, 811–12 (Tex. App.—Houston [1st Dist.] 1986, no writ); see also Smith v. Allstate Insurance Co., 467 F.2d 104, 107 (5th Cir.1972). On the other hand, the

Texas Supreme Court has ruled that such a sale without compliance with the Certificate of Title Act is invalid against an innocent secured third party who properly receives its lien before the car is purchased. Phillips Ford, Inc. v. St. Paul Fire & Marine Insurance Co., 465 S.W.2d 933 (Tex.1971). However, the Texas courts have not ruled on the question appellants claim is relevant to the present case: whether a car sale not in compliance with the Texas Certificate of Title Act is valid against a party who later receives a lien on the car as provided in the Certificate of Title Act. We do not rule on this issue either, as the outcome of this case is not dependent upon its resolution.

**5.** We note that this argument conflicts with Thomas' and Robert Gunter's trial testimony admitting that by presenting car titles to the banks in accordance with their floor plans, they understood that they were representing that Robert Gunter or the companies in fact owned the cars so pledged.

to lend money against cars owned by innocent third-party purchasers at the time they received the titles. Thomas and Robert Gunter admitted in trial that they knew they were supposed to own the cars they pledged, that the banks expected them to own them, and that they understood that by presenting the titles to the banks they were representing to them that Robert Gunter or the companies owned the cars. Finally, common sense tells us that a commercially reasonable bank would not lend money against a probable lawsuit between it and the innocent purchaser of a car pledged, especially one it might lose. *See* note 4, *supra.* Thus, sufficient evidence supports the jury's conclusion that the parties understood appellants to be representing that the companies owned the cars they pledged and not just that they had the power—by withholding car titles rightfully belonging to and in many cases being demanded by purchasers—to transfer superior liens to the banks.

■ Finally, appellants assert that the government did not present sufficient evidence at trial for a reasonable jury to conclude that they "knowingly" pledged titles for cars the companies did not own. We disagree. A comparison of the dates on which the companies sold the cars in question—as reflected in the companies' sales records kept in the same office in which appellants did the title work—to the dates on which appellants pledged the titles to those cars, shows that appellants pledged titles for several cars that the companies had already sold, had been paid for in full, and had long since been driven off the companies' car lots, some of them several months previously. The government put on several witnesses who had purchased these cars and who testified that they had not given their permission for their titles to be pledged. Many also said that after buying their cars they had pestered appellants for weeks and months in an effort to acquire long overdue paperwork, including their car titles. Also, Thomas admitted that she personally pledged the title to a car that she personally had sold to Kimberly Poston fourteen months earlier. Although this car was not listed in the indictment, the incident constitutes a similar act evidencing a fraudulent practice in which appellant Thomas could be found to have knowingly engaged.

Thomas further testified that although the title work for cars the companies sold often was not completed for months, she considered any car title physically present in the companies' offices pledgeable on the floor plans. That is, she stated that she assumed that the companies owned those cars and made no effort to walk across the room to check the sales files to ensure that the cars had not already been sold.

Anchuree Nantirux, whom the companies employed as a runner and title clerk during the relevant time period, testified that when a car was sold appellants routinely calculated the salesperson's commission and the companies' net profit by the fifth of the next month. This weighs against an excuse of inadvertence (delay in the paperwork) for pledging the titles months later.

We find that the evidence is sufficient for a reasonable jury to conclude that appellants knowingly pledged titles for cars the companies did not own. The lengthy periods between when the cars were sold and pledged, coupled with testimony of the new owners that they had repeatedly requested their paperwork from appellants following their purchases, is enough to support the conclusion that appellants were aware the cars had been sold. Consequently, the intent element of the crimes for which appellants were convicted was sufficiently proven. We thus reject all of appellants' sufficiency of the evidence arguments as to the substantive counts, and likewise reject their challenges to their convictions on the conspiracy count, as to which they argue the evidence is insufficient for the same reasons.

*Jury charge*

Appellants next claim that the district court abused its discretion by omitting their requested jury instructions on a defense of good faith. Our decisions on when a requested good faith defense instruction must be given are in some tension. Certain earlier cases indicate that

the court's refusal to give such a requested instruction as a defense to a crime charging an "intent to defraud" is *per se* reversible error because " 'a defendant is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to the theory of his defense.' " *United States v. Lewis,* 592 F.2d 1282, 1286 (5th Cir.1979) (quoting *United States v. Wolfson,* 573 F.2d 216, 221 (5th Cir.1978)); *see also United States v. Goss,* 650 F.2d 1336, 1344–45 (5th Cir.1981). Later cases have distinguished the *Lewis* and *Goss* line, stating that the court's failure to give such an instruction is reversible error only when the charge, "examined in the full context of trial including the final arguments of counsel," has thwarted defendant's presentation of his good faith defense. *United States v. Fooladi,* 746 F.2d 1027, 1030–31 (5th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985). *See also United States v. Chenault,* 844 F.2d 1124, 1130 (5th Cir.1988); *United States v. Hunt,* 794 F.2d 1095, 1098 (5th Cir.1986); *United States v. Kimmel,* 777 F.2d 290, 293 (5th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct.1947, 90 L.Ed. 2d 357 (1986). In *United States v. Gray,* 751 F.2d 733, 735–36 (5th Cir.1985), we pointed out that *Fooladi* applied the principles of such pre-*Lewis* and -*Goss* decisions as *United States v. Wellendorf,* 574 F.2d 1289 (5th Cir.1978), and *United States v. Barham,* 595 F.2d 231, 234 (5th Cir.1979), and that *Wellendorf* and *Fooladi* hence represented the law of the Circuit.

Appellants' requested good faith defense instruction would be reasonably understood by the district court as related only to the conspiracy count. The requested instruction commenced by stating, "[a] conspiracy to defraud requires proof of fraudulent intent," and at the charge conference appellants made clear that this request related to the conspiracy count, directing the court's attention in that respect only to the conspiracy portion of its charge and stating, "[W]e submit to the Court with regard to the Court's charge on conspiracy ... there was raised ... to the offense of conspiracy the defense of good faith reliance or honest intent." We have never held that failure to give such a requested defensive charge—essentially allowing the jury to acquit if it finds that defendants made a mistake of fact rendering their actions in good faith and excluding the possibility that they acted with specific intent—as to a conspiracy count is, *per se,* reversible error. Conspiracy under 18 U.S. C. § 371 requires an overt act and an agreement to commit the substantive offense. One cannot so agree by mistake. Therefore, there is less need for a special instruction explaining good faith as to such a count, at least where, as here, the jury is fully charged on the elements—including the requisite mental state—of the object offenses of the conspiracy and those offenses are likewise submitted to the jury as substantive counts. Accordingly, we apply *Fooladi* to this claim of reversible error.

■ The present charge clearly instructs that the conspiracy, which must be found in order to convict under Count 1, is an agreement to "knowingly" execute and attempt to execute "a scheme and artifice to defraud and to obtain the monies and funds" of federally insured banks "by means of false and fraudulent pretenses, representations and promises, in violation of" 18 U.S.C. § 1344, and to "knowingly" make "materially false statements for the purpose of influencing the action of" federally insured banks "in violation of" 18 U.S. C. § 1014. The charge defined "knowingly" as "voluntarily and intentionally and not because of mistake or accident," and stated that "willfully" meant "voluntarily and purposely, with the specific intent to do something the law forbids; ... with bad purpose either to disobey or disregard the law." Likewise, the jury was instructed that in order to convict under Count 1, the defendant must "knowingly and willfully" have joined in the unlawful scheme. The jury was correctly instructed on the substantive counts (and the state of mind required thereunder) which were the object offenses of the conspiracy, and it found appellants guilty on all these counts. Considering the record as a whole in the full context of the trial, we are convinced that the jury fully understood that in order to

convict it had to find that appellants knowingly and willfully conspired to make knowing misrepresentations to the banks to obtain funds or credit from them and that the failure to give appellants' requested instruction respecting a good faith defense to the conspiracy count did not thwart appellants' presentation of their defense and does not constitute reversible error.

■ Appellants next argue that the court erred by refusing to charge the jury that it had to find that appellants had the specific intent to defraud the banks in question before convicting them of the section 1344 counts, 2 through 7. We reject this contention because the district court did adequately charge on "intent to defraud" (to the extent, if any, that it is a required element under section 1344 and might mean something more than an intent to obtain money or credit, or the like, by knowingly false or fraudulent pretenses or representations, on which elements the district court also correctly instructed). The charge required the jury to find that appellants used false or fraudulent pretenses, and defined "false" or "fraudulent" as a statement or representation that "relates to a material fact and is known to be untrue or is made with reckless indifference as to its truth or falsity, and is made or caused to be made with *intent to defraud.*" (Emphasis added.) The charge further defined "intent to defraud" as "act[ing] knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self."

Finally, in relation to the jury charge, appellants assert that the court erred by refusing to give a multiple conspiracy charge. They allege that the proof adduced at trial allowed the jury to find that there were two separate conspiracies, one to kite checks and one to pledge titles to cars that the companies did not own. By refusing a multiple conspiracy charge, appellants contend, the court facilitated a less than unanimous verdict, even on the substantive counts because of the potential prejudicial spillover that the evidence of

the "other conspiracy" might have on each substantive count. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946).

■ In order to determine whether there is a fatal variance between the indictment charging a single conspiracy and the proof, this Circuit has held that it is necessary to "count" the number of conspiracies proved at trial. *See, e.g., United States v. Richerson,* 833 F.2d 1147, 1152–53 (5th Cir.1987). "[T]he principal factors are (1) the existence of a common goal, (2) the nature of the scheme and (3) overlapping of participants in the various dealings." *Id.* Gunter, Thomas, and Robert Gunter participated in both the check kiting and title pledging. Further, the evidence shows that appellants' submission of the companies' non-owned car titles was part and parcel of the overall check kiting scheme, directed toward the common goal of obtaining loans against transparent security in order to maintain a floundering business. *See United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982) ("Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, ... the existence of a single conspiracy will be inferred."). The evidence does not show that the conspiracy charged was two conspiracies. The district court instructed that the jury had to be unanimous on what overt act or acts supported the conspiracy charge. The failure to charge on multiple conspiracies was not reversible error.

### Striking witness Randall's testimony

Appellants last argue that the district court deprived them of a fair trial by striking Ezell Randall's partial testimony and by denying them a continuance to secure Randall's testimony. We hold that the court's decision to strike the testimony was not reversible error.

On November 3, 1987, Randall was called by Robert Gunter. He was to appear the next day to be examined by counsel for the appellants and the government, but could

not because of illness. After several telephone conferences with Randall's doctor, the district court found that Randall's health would be jeopardized by further testifying, and that it was unclear when, if ever, Randall's health would sufficiently improve to allow him to testify.

Randall testified on direct examination that Robert Gunter had a good reputation in the community as a peaceful and law-abiding individual, and for honest business dealings. He also testified about helping Robert Gunter clear up some 1985 overdraft problems, as well as assisting Robert Gunter to reduce the instant overdrafts. Robert Gunter testified as to the same transactions between himself and Randall.

Randall's testimony was cumulative of Robert Gunter's testimony, and had only attenuated and indirect relevance to appellants. In these circumstances, and given that Randall could not be cross-examined by the government, the district court's striking of his partial testimony did not deprive appellants of a fair trial so as to require reversal of their convictions. *See United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983). *See also Lawson v. Murray,* 837 F.2d 653, 656 (4th Cir.1988). Nor was it reversible error for the court to deny a continuance in light of the judicial resources that had already gone into the trial, and the fact that Randall's eventual availability was uncertain and indefinite. *Cf. Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) (trial courts must be granted broad discretion on matters of continuances).

### Conclusion

The jury had sufficient evidence to conclude that appellants knowingly misrepresented to federally insured banks that Robert Gunter or one of the companies owned the cars whose titles they pledged on floor plan credit agreements. None of the alleged errors in the court's charge to the jury requires reversal. Finally, the court's striking of the partial testimony of witness Randall presents no reversible error. Appellants' convictions and sentences are AFFIRMED.