**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lawrence GOLDSTEIN, Richard I. Silberg, and Frank J. Jones, Defendants-Appellants.**

**Nos. 79–1769 to 79–1771.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 17, 1980.

Decided May 22, 1981.

Rehearing Denied Jan. 21, 1983.

Thomas A. Hamill of Hamill, Lentz, Neill & Dwyer, Shawnee Mission, Kan., for defendant-appellant Richard I. Silberg.

Michael Lerner of Barnett & Lerner, Chartered, Kansas City, Kan., for defendant-appellant Frank J. Jones.

John Oliver Martin, Asst. U. S. Atty., Kansas City, Kan. (James P. Buchele, U. S. Atty., Kansas City, Kan., with him, on brief), for plaintiff-appellee.

Before SETH, Chief Judge, and BARRETT, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

These companion appeals arise from the convictions of defendants Lawrence Goldstein, Richard Silberg and Frank Jones on ten counts of mail fraud in violation of 18 U.S.C. §§ 2, 1341, and four counts of making false statements in violation of 18 U.S.C. §§ 2, 1001. In addition, defendants were convicted of one count of unauthorized distribution and possession of controlled substances in violation of 21 U.S.C. § 841(a)(1). We affirm in part and reverse in part.

Defendants were charged with devising a scheme to defraud the state of Kansas and the United States by making false claims for payments under the Kansas medicaid program. Defendants were also charged with distributing drugs from a pharmacy not registered as required by the United States Drug Enforcement Administration (DEA). The alleged fraudulent scheme involved the clinic of Dr. Jones, an osteopathic physician. Goldstein, a pharmacist registered with the DEA and the state of Kansas, owned the Morrow & Keeling pharmacy, which was also registered in compliance with federal and state law. Morrow & Keeling was located several blocks from Jones' clinic. Silberg, a registered pharmacist, was employed by Goldstein as the manager of Morrow & Keeling.

The Morrow & Keeling pharmacy was a participant in the Kansas medicaid program. Pursuant to the relevant Kansas

Monti L. Belot of Weeks, Thomas, Lysaught & Mustain, Chartered, Kansas City, Kan., for defendant-appellant Lawrence Goldstein.

regulations, reimbursement under the program was provided only for drugs prescribed by the recipient's attending physician and dispensed in a licensed pharmacy by a licensed pharmacist. Providers of pharmaceutical items under the medicaid program were reimbursed by the state according to a payment formula based on each individual pharmacy's operating costs. Each pharmacy was required to submit yearly data from which the state determined the appropriate fee. Doctors who themselves filled prescriptions could not be reimbursed under the program for the drugs they provided except under circumstances not relevant here.

Dr. Jones operated the Riverside Clinic in Kansas City, Missouri, and the Central Clinic in Kansas City, Kansas. We are concerned here with the operation of the Central Clinic. During the relevant time, the Riverside Clinic was registered to possess controlled substances pursuant to federal and state law; the Central Clinic was not so registered. Dr. Jones himself was registered to prescribe controlled substances. Shipments of controlled drugs were received at the Riverside Clinic and transferred as needed to the Central Clinic.

In the fall of 1975, Goldberg and Dr. Jones reached an agreement under which Morrow & Keeling maintained a stock of drugs at the Central Clinic. Dr. Jones himself filled prescriptions for medicaid recipients from this stock. However, Morrow & Keeling submitted the claims for medicaid reimbursement for these drugs using its own provider number. Dr. Jones received a

dispensing fee of 25¢ for every prescription that was processed this way. The fee was later raised to 50¢.

In March of 1977, Gilbert Emick, a registered pharmacist employed by Morrow & Keeling, began to work at the Central Clinic two days a week, filling prescriptions from the Morrow & Keeling stock at the clinic and submitting medicaid claims on the Morrow & Keeling number. These claims were authorized by Silberg, the manager of Morrow & Keeling, who also prepared the yearly pharmacy cost studies that the state required each pharmacy claiming medicaid reimbursement to submit. Silberg received a monthly salary plus 50% of the gross profits of the store. In 1975 Medicaid reimbursed Morrow & Keeling $31,862, which represented payment for 5,706 claims. Medicaid paid Morrow & Keeling $189,319 for 31,231 claims in 1976, $282,375 for 44,406 claims in 1977, and $282,058 for 39,435 claims in 1978. During this period Dr. Jones received a total of approximately $27,195 in payments from Morrow & Keeling, representing some 60,000 prescriptions.

 The essence of the fraudulent scheme charged by the Government in the section 1341[1] counts is that by using the Morrow & Keeling provider number in submitting claims for prescriptions actually filled at the Central Clinic, defendants were able to receive reimbursements higher than those to which they were entitled, or reimbursements for prescriptions excluded entirely from medicaid coverage.[2] Each of

---

1. The mail fraud statute provides in pertinent part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any

such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."
18 U.S.C. § 1341.

2. We note defendant Silberg's argument that prejudicial error occurred when the Government presented an alternative theory of fraud during the course of the trial. The Government began by describing the fraudulent scheme as the intent by defendants to recover higher reimbursement fees than those to which they were entitled. In response to defendants' position at trial that the Central Clinic was not a pharmacy under Kansas law, the Government offered evidence to show that the defendants were entitled to no reimbursements at all for

the three defendants allegedly agreed to the scheme, aided in its success, and benefitted financially from it. The charges of making false statements in violation of 18 U.S.C. § 1001[3] resulted from defendants' use of the Morrow & Keeling provider number, name, and address in the pharmaceutical claim forms submitted for the Central Clinic prescriptions. The alleged violations of 21 U.S.C. § 841(a)(1)[4] rest on the fact that the Central Clinic was not registered with the DEA to possess or dispense controlled drugs.

We affirm defendants' convictions on the counts alleging violations of 18 U.S.C. §§ 2, 1001, and 1341. However, we reverse their convictions on the count alleging violations of 21 U.S.C. § 841(a)(1) and remand with directions to dismiss that count.

## I.

### The Section 841(a)(1) Count

Defendants Goldstein, Jones, and Silberg were all properly registered with the DEA to dispense controlled substances. The Government made no allegation in the indictment and presented no evidence at trial that the prescriptions written by Dr. Jones and filled at the Central Clinic were not prescribed for legitimate medical purposes in the usual course of professional treatment. Indeed, the evidence showed that the drugs were properly dispensed as part of Dr. Jones' professional practice. However, the Central Clinic itself was not registered with the DEA as a location to maintain controlled substances until April 1978. Thus, the issue before us is whether the dispensing of controlled substances by reg-

istered practitioners for valid medical reasons is a violation of 21 U.S.C. § 841(a)(1) when the controlled substances are dispensed from an unregistered location.

Defendants contend that their conduct does not constitute an offense under section 841(a)(1) because the legislative intent behind the enactment of that section was to subject to prosecution only those persons, registered and unregistered, who traffic in or "push" controlled substances by dispensing them for profit rather than in the usual course of professional practice. They argue that registered practitioners are not covered by section 841 unless they divert drugs from legitimate medical purposes.

The Government responds that the purpose of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, is to maintain complete control over all drug transfers by providing for a closed system of legitimate drug distribution. An essential element of this closed system is registration. The Government essentially contends that if any link in the transfer of a controlled substance is not properly registered, the transfer is not authorized and therefore violates section 841(a)(1).

Section 841(a)(1) provides: "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." Authorized activities are defined by 21 U.S.C. § 822(b) as follows:

"Persons registered by the Attorney General under this subchapter to manufac-

---

prescriptions not filled at a licensed pharmacy. We find no prejudicial error in allowing the Government to counter a defense expressly raised by defendants, who can hardly claim surprise.

**3.** 18 U.S.C. § 1001 provides:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same

to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**4.** 21 U.S.C. § 841(a)(1) provides:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

ture, distribute, or dispense controlled substances are authorized to possess, manufacture, distribute, or dispense such substances ... to the extent authorized by their registration and in conformity with the other provisions of this subchapter."

We can find no case in which these provisions have been construed in the precise factual setting presented by this appeal. Numerous decisions of this and other circuits have held that a physician or pharmacist who is registered and who dispenses controlled substances in the usual course of professional conduct is immune from prosecution under section 841(a)(1). *See, e. g., United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1981), ("[R]egistered doctors (or other practitioners) are exempt from criminal liability under § 841(a)(1) unless they were acting outside the usual course of professional practice."); *United States v. Smurthwaite*, 590 F.2d 889, 891 (10th Cir. 1979); *United States v. Kirk*, 584 F.2d 773, 784 (6th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978); *United States v. Black*, 512 F.2d 864, 868 (9th Cir. 1975); *United States v. Bartee*, 479 F.2d 484, 487 (10th Cir. 1973).

This immunity has been inferred either from 21 U.S.C. § 822(b) or from a joint reading of 21 U.S.C. §§ 829(a), (b) [5] and 21 C.F.R. § 306.04(a) (1973) (redesignated as 21 C.F.R. § 1306.04(a) (1973)).[6]

Although the courts have consistently limited prosecution of registered practitioners under section 841(a)(1) to those acting outside the scope of legitimate medical practice, the Government argues that these cases are not controlling here because they do not involve dispensing drugs from an unregistered pharmacy. This distinction is not persuasive in view of the significant observations made by the Supreme Court in *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975). There the Court held that registered physicians can be prosecuted under section 841 when their activities fall outside the usual course of professional practice, reversing the court of appeals decision that a physician is exempted from prosecution by virtue of his status as a registrant. But in so holding, the Court emphasized that "Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant." *Id.* at 134, 96 S.Ct. at 341. In fact, the Report of the Senate Judiciary Committee on an earlier controlled sub-

5. 21 U.S.C. § 829 in relevant part provides:
"(a) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, *no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without the written prescription of a practitioner*, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription in accordance with section 353(b) of this title. Prescriptions shall be retained in conformity with *the requirements of section 827 of this title. No prescription for a controlled substance in schedule II may be refilled.*
"(b) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule III or IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without a written or oral prescription in conformity with section 353(b) of this title. *Such prescriptions may not be filled or refilled more than six months after the date*

thereof or be refilled more than five times after the date of the prescription unless renewed by the practitioner."

6. This regulation provides in pertinent part:
"A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and *the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.*"

stances act had described the counterpart of § 841 as applying to "traffickers." *See id.* The Court also pointed out that

"the penalty to be imposed for a violation was intended to turn on whether the 'transaction' falls within or without legitimate channels. All persons who engage in legitimate transactions must be registered and are subject to penalties under §§ 842 and 843 for '[m]ore or less technical violations.' HR Rep. No. 91–1444, p 10. But 'severe criminal penalties' were imposed on those, like respondent, who sold drugs, not for legitimate purposes, but 'primarily for the profits to be derived therefrom.'"

*Id.* at 135, 96 S.Ct. at 342.

█ We find this language a clear indication that only those drug transactions occurring outside legitimate distribution channels may be prosecuted under section 841(a)(1). Accordingly, we hold that the transfers here were not subject to the sanctions of that section. Whether the defendants could have been properly charged under another section of the Controlled Substances Act is not before us. The convictions of defendants for violating 21 U.S.C. § 841(a)(1) are reversed.

## II.

### *The Mail Fraud Counts*

█ Defendants contend that applying the mail fraud statute, 18 U.S.C. § 1341, to the facts of this case was constitutionally invalid because defendants did not have fair warning that their conduct was criminal.[7] They correctly concede that a fraudulent scheme charged under section 1341 need not violate state law. *See, e. g., United States v. Mandel,* 591 F.2d 1347, 1361 (4th Cir. 1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), and cases cited therein. Nonetheless, they argue that where, as here, the fraudulent scheme

arises out of an activity regulated by the state, the relevant state law and regulations must be shown to provide adequate notice of prohibited conduct. They contend that the relevant state regulations governing medicaid payments for pharmaceutical items did not require the Central Clinic operation to have its own provider number, nor did they prohibit Morrow & Keeling from submitting claims for drugs dispensed at the Central Clinic under the Morrow & Keeling provider number.

We begin by noting that defendants were charged with the crime of mail fraud, not with violating the Kansas medicaid program. The essence of an offense under section 1341 is use of the mails to execute a fraudulent scheme. *See United States v. Allen,* 554 F.2d 398, 408 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977). In determining whether conduct is to be considered a scheme to defraud we have stated that "fraudulent representations, as the term is used in 18 U.S.C.A. § 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and [that] the devising of a scheme for obtaining money or property by such statements or concealments is within the prohibition of the statute." *Id.* at 410. The Kansas medicaid laws and regulations are relevant to the frauds charged only insofar as they establish adequate guidelines under which defendants should have known what material facts they had a duty to disclose in claiming medicaid reimbursements.

Under Kansas law "the term 'pharmacy' means and includes every drugstore or shop or other place where (1) drugs are dispensed or sold at retail ...." Kan.Stat. § 65–1626(e). Webster's Third New International Dictionary (1976) defines "retail" as "the sale of commodities or goods in small quantities to ultimate consumers." Thus, it appears that the Central Clinic operation was

---

**7.** We reject defendant Silberg's argument that applying the mail fraud statute was improper because it invaded the province of the state. "Even if the substance of the scheme to defraud involves matters normally within the purview of state control or regulation, once the

mails are utilized to effectuate the scheme, the federal government has the right to prosecute the schemer under the mail fraud statute." *United States v. Mandel,* 591 F.2d 1347, 1358 (4th Cir. 1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

a pharmacy under Kansas law. It is illegal to operate, maintain, open, or establish any pharmacy in Kansas without first obtaining a permit from the state board of pharmacy. Kan.Stat. § 65–1643(a). Furthermore, in 1975 a Kansas regulation was adopted providing that "[n]o pharmacy nor pharmacist shall have, participate in, or permit an arrangement, branch, connection or affiliation whereby prescriptions are solicited, accepted, collected, or picked up . . . from or at any location other than a pharmacy for which a registration in good standing has been issued by the board." Kansas Administrative Regulations (K.A.R.) 68–2–16.

Under the Kansas medicaid regulations in effect during the relevant periods in this case, pharmaceutical goods eligible for state reimbursement were limited to drugs dispensed in a *licensed pharmacy*. *See* K.A.R. 30–5–21. A physician dispensing pharmaceuticals could *not* be reimbursed for such drugs unless he practiced in an area that did not have a licensed pharmacy. *Id.* This exception does not apply here. The fees paid to pharmacies for medicaid prescriptions were "based upon the individual pharmacy's operating cost determined by data submitted by the pharmacy plus a reasonable profit, subject to the department's budgetary limitations." K.A.R. 30–5–26.

The above cited statutes and regulations plainly specified that medicaid claims could be submitted only for prescriptions dispensed by a registered pharmacy. Those dispensed by a physician under the present circumstances were not eligible. The program created a duty in those submitting medicaid claims to disclose the facts relevant to a determination of eligibility, such as whether the prescriptions were filled at a licensed pharmacy by a licensed pharmacist.

We do not find persuasive defendants' argument that the pertinent Kansas regulations did not require the clinic pharmacy to have its own provider number. The Kansas

medicaid program was designed to reimburse each "individual pharmacy" with a dispensing fee corresponding to the cost incurred by that pharmacy to fill each prescription. The fee determination was based on such operating expenses as real estate taxes, rental, repairs, insurance, and utilities fees. The medicaid program anticipated that each separate physical location was to receive a fee based on its own individual operating expenses. Thus defendants had a corresponding duty to disclose operating expenses for each individual location where medicaid prescriptions were dispensed. Even assuming arguendo that the regulations could be construed to permit a dispensing fee based on the combined operating costs of the Central Clinic and the Morrow & Keeling pharmacy, defendants would nonetheless have had a duty to disclose those operating costs resulting from the dispensing of medicaid prescriptions at the Central Clinic.

In summary, the Kansas medicaid program required participants to disclose whether the prescriptions were filled at a licensed pharmacy, whether they were filled by a licensed pharmacist, and what operating expenses were incurred at the physical location from which the drugs where dispensed.[8] If defendants failed to disclose those material facts intending thereby to aid the execution of a fraudulent scheme, their conduct clearly falls within section 1341.

■ We therefore turn to defendants' argument that the evidence of intent to defraud was insufficient to support their convictions. Where intent is an element of the crime charged, the issue is particularly one for the jury. It is the jury's province to determine whether a defendant knew his conduct was an illegal act, and its duty to weigh evidence and draw reasonable inferences therefrom in making its judgment.

---

8. Accordingly, we find this case factually distinguishable from *United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979). In *Porter* the court found that no materially false statements were filed concerning the claims made. *See id.* at 1055, 1057 n.7. The regulations simply did not impose a duty to disclose the information allegedly forming the basis of the fraudulent scheme. Here, to the contrary, the Kansas regulations did impose the duties to disclose set out above.

In so doing, the determination of credibility is the jury's function. *United States v. Dennett*, 551 F.2d 261, 262 (10th Cir. 1977); *United States v. Downen*, 496 F.2d 314, 319 (10th Cir.), *cert. denied*, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974). The appellate court must view the evidence and all its reasonable inferences most favorably to the verdict in determining whether substantial evidence supports it. *United States v. Brinklow*, 560 F.2d 1008, 1009 (10th Cir. 1977); *Downen*, 496 F.2d at 318.

The evidence that substantially supports the jury's conclusion may be summarized as follows. It is undisputed that the Central Clinic was not licensed as required by state and federal law. The existence of the clinic was not revealed in the cost studies submitted by Morrow & Keeling, even though a large percentage of the prescriptions for which it submitted claims were filled there. The payments made by Morrow & Keeling to Dr. Jones were likewise not set out in the cost studies.[9] For many months, Dr. Jones filled the prescriptions himself knowing he could not have been reimbursed for them had he applied directly, because he did not have a provider number for dispensing drugs. Thus, he agreed with Goldstein and Silberg to seek reimbursement through Morrow & Keeling. From this evidence the jury could reasonably infer that defendants deliberately misstated the facts, or aided and abetted in such misstatement,[10] thereby concealing the existence of the Central Clinic operation from the Kansas medicaid authorities.

The record contains evidence that the Morrow & Keeling pharmacy received the maximum fee for each prescription allowed to medicaid providers in fiscal 1976 and 1977: $2.25 and $2.35 respectively. A medicaid provider who failed to submit the operating cost study used to determine the fee could only receive reimbursement based on the lowest filed fee for all pharmacies submitting a cost report. This fee was $1.29 for fiscal 1976 and $1.30 for fiscal 1977. A new pharmacy with less than six months of operating costs would receive a fee based on the state-wide average. In fiscal 1976 this fee was $1.85, and in fiscal 1977 it was $2.00. Furthermore, there were facts presented from which the jury could have concluded that the operating expenses of the Morrow & Keeling pharmacy were higher than those resulting from the filling of prescriptions at the Central Clinic, and that a dispensing fee based only on the operating costs of the Central Clinic would have been lower than the fee assigned to Morrow & Keeling. From this evidence the jury could reasonably have inferred that defendants deliberately misstated the facts in their medicaid claims in order to receive medicaid reimbursement at a rate higher than permitted by the regulations. "Intent may be inferred from conduct and circumstantial evidence, upon which reasonable inferences may be based." *United States v.*

9. Silberg testified that when he filled out the cost studies he worked in the payments made to Dr. Jones "[a] little here and a little there," Rec., vol. 7, at 588, and that the payments were never set out and identified as such. *See id.* at 586–89.

10. The jury was instructed under 18 U.S.C. § 2 that "[w]hoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Rec., vol. IX, at 893. We believe this instruction was particularly pertinent to Dr. Jones because he did not submit any medicaid claims for drug reimbursement directly to the state of Kansas. In *United States v. Taylor*, 612 F.2d 1272, 1275 (10th Cir.), *cert. denied* 444 U.S. 1092, 100 S.Ct. 1060, 62 L.Ed.2d 782 (1980), we recently said:

"To be guilty of aiding and abetting, the defendant must be found to have willfully associated himself in some positive way with the criminal venture by showing that he has joined the enterprise as something he wishes to bring about and by seeking to make it succeed by some action on his part.... However, 'evidence of an act of relatively slight moment may warrant a jury's finding participation.' *United States v. Garguilo*, 310 F.2d 249 (2d Cir. 1962). It is necessary only that the defendant knowingly associate himself in some way with the criminal venture in order to be an aider and abetter. *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949)."
It is for the jury to evaluate the evidence and to determine whether a particular defendant willingly aided the commission of a crime. *See id.* at 1276.

**1236**

*Curtis*, 537 F.2d 1091, 1097 (10th Cir.), *cert. denied*, 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976).

The jury was properly instructed that an honest, good faith belief that the conduct was lawful and legitimate is a complete defense to the charge of mail fraud. It was also instructed that a defendant who in good faith relies on the advice of his attorney after a full and accurate disclosure does not act with the intent necessary to commit mail fraud. Defendants presented these defense theories vigorously, but the jury rejected them. It is the jury's duty to assess credibility and to determine the weight to be given any testimony. *Downen*, 496 F.2d at 319. We have carefully reviewed the record, and we conclude that substantial evidence supports the verdict.

### III.

### *The False Statements Counts*

Defendants were convicted on four counts of violating 18 U.S.C. §§ 2, 1001 by making a false statement, or by aiding and abetting such crime, in a matter within the jurisdiction of a department or agency of the United States. The Government contends that defendants violated the statute by putting the Morrow & Keeling provider number, name, and address on the pharmaceutical claim forms submitted for Central Clinic prescriptions. We reject defendants' claim that they lacked the intent to commit the crime for the same reasons we sustained the jury verdict on the mail fraud counts. Their argument that there was insufficient evidence to show the location where the prescriptions were filled similarly lacks merit.

Defendants contend, in addition, that the false statements were not made in a matter within the jurisdiction of the United States. However, this court has held that where the federal government reimburses a nonfederal agency and false statements are made on an application for benefits under such a program, the jurisdictional element of section 1001 is satisfied. *See United States v. Wolf*, 645 F.2d 23, 24–25

(10th Cir. 1981); *United States v. Radetsky*, 535 F.2d 556, 567–68 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976) (prosecution under 18 U.S.C. § 1001 proper in case of medicaid fraud). We also reject defendants' argument that the trial court improperly decided this issue as a matter of law. Whether a statement established by the evidence is within the jurisdiction of an agency or department of the United States is a question of law to be decided by the court. *Gonzales v. United States*, 286 F.2d 118, 123 (10th Cir. 1960). Accordingly, the convictions on the false statement counts are affirmed.

We have carefully considered defendants' remaining contention that prosecutorial misconduct in closing argument created prejudice requiring a new trial. Our review of the record reveals this claim to be without merit.

Defendants' convictions under 21 U.S.C. § 841(a)(1) are reversed. The convictions on the counts charging violations of 18 U.S.C. §§ 2, 1341, and 1001 are affirmed.