**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Dr. Mike FOOLADI,**
**Defendant-Appellant.**

**No. 84–1117.**

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1984.

---

Raymond C. Caballero, Barbara Wiederstein, El Paso, Tex., for defendant-appellant.

Edward C. Prado, U.S. Atty., El Paso, Tex., Sidney Powell, C. Larry Matthews, Jr., Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, TATE, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Dr. Mike Fooladi appeals from a conviction by a jury of one count of manufacturing phenyl-2-propanone and one count of attempting to manufacture amphetamines, contrary to 21 U.S.C. § 841(a)(1). Fooladi urges that the evidence was insufficient to support the verdict, and that the district court did not adequately explain to the jury his defense that he did not know that what he was doing was illegal. He also asks us to reconsider an earlier-decided search question arising from the search of his home laboratory. We affirm.

I

Fooladi, a Ph.D. in chemistry, worked for several chemical companies as a researcher. In 1980, he enrolled in a two-year M.D. program at a medical school in Ciudad Juarez, Mexico, near his home in El Paso.

During 1981 and 1982, Fooladi attracted the attention of the DEA by purchasing laboratory glassware for use at a residential address, and by ordering from a doctor in Laredo 25 pounds of sodium acetate, an uncontrolled chemical, but apparently one that can be used in drug manufacturing. When DEA agents discovered that Fooladi had only crossed the Mexican border twice in the past month, they suspected that he was not really a medical student.

DEA agents rented a vacant building next to Fooladi's residence. When they smelled the odor of phenyl acetic acid, another uncontrolled chemical known to DEA agents as a possible ingredient in amphetamines, they obtained a warrant to search Fooladi's residence. The agents executed the warrant and found different chemicals, including phenyl-2-propanone, an immediate precursor of amphetamines and a Schedule II controlled substance. They also discovered several formulas for converting P–2–P into amphetamines. Fooladi told the agents that he was manufacturing P–2–P because he intended "to convert the P–2–P into amphetamines and later into a slow release type drug for use in weight control." They arrested Fooladi.

Before trial, Fooladi moved to suppress the evidence seized from his lab based on the search warrant's alleged illegality. The district court granted the motion, but a panel of this court reversed. *United States v. Fooladi*, 703 F.2d 180 (5th Cir. 1983).

Fooladi was convicted of knowingly or intentionally manufacturing P–2–P and of knowingly or intentionally attempting to manufacture amphetamines, in violation of 21 U.S.C. § 841(a)(1). He did not testify at his trial; at his sentencing hearing, Fooladi for the first time directly told his story. Judge Hudspeth, stating, "I'll give you the benefit of the doubt about the possibility that you might have been doing something that in your own mind you thought was legitimate or non-criminal," sentenced Fooladi to concurrent 3-year suspended sentences on the two counts, and imposed 5 years of supervised probation and a $1500 fine.

II

Over objection, the trial court refused to give three of Fooladi's requested jury in-

structions. Two of these spelled out his theory that if acting under a good-faith belief that his behavior was legal, or if ignorant of the law, he could not have had the specific intent to commit a crime required for a conviction under § 841(a)(1).[1] Instead, the court gave a pattern instruction,[2] which includes the following passage:

> The word "willfully," as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

■ Looking at the charge without the context of trial, Fooladi argues forcefully that the jury should have been given a more complete explanation regarding his contention that he did not know his conduct to be unlawful. The four corners of the charge are not the end of the inquiry, though. To determine whether the trial court's failure to give a requested jury instruction violates a defendant's right to the fair trial guaranteed him by the Due Process Clauses of the Fifth and Fourteenth Amendments, the charge must be examined in the full context of trial including the final arguments of counsel. *See United States v. Bush,* 599 F.2d 72, 78 (5th Cir.1979). Indeed, we have granted habeas relief to a state prisoner when a jury charge laid alongside a prosecutor's final argument communicated an erroneous theory of law, although the charge did not do so when read in the abstract. *Plunkett v. Estelle,* 709 F.2d 1004 (5th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984). In declining to review asserted error in the charge in isolation from its tactical scene, we were applying the Supreme Court's caveat that "the process of instruction itself is but one of several components of the trial[.]" *Cupp v.*

*Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

■ A central purpose of the charge is to provide the framework for the argument by the counsel. Our review of the closing arguments by counsel lead us to the conclusion that Fooladi's contention that he was innocently engaged in research and unaware that producing P–2–P was illegal was fully and completely developed for the jury. As noted, the judge told the jury that the word "willfully" meant that the defendant knowingly did an act which the law forbade, purposely intending to violate the law. Of course, Fooladi could not purposely intend to violate the law if he thought his work was legal. This instruction allowed Fooladi's lawyer to argue his chosen defense, and he did so.

Fooladi's counsel, without objection, explained to the jury in his summation that "they [the prosecution] have to prove by evidence beyond a reasonable doubt that he did it purposefully and intending to violate the law. That's where they don't have any evidence. I mean it doesn't even come close there, purposely intended to violate the law." The closing arguments make plain that issue was joined not over the question of entitlement to the defense but over whether the facts in the case warranted the jury's belief beyond a reasonable doubt that Fooladi knew that what he was doing was unlawful. Reading the record as a whole, we are convinced that Fooladi, as was his constitutional right, had his defenses fully presented to the jury.

This case is therefore distinguishable from cases in which the court failed to charge the jury at all on a central element of the defense, or gave an instruction that thwarted a proper defense theory. In *United States v. Schilleci,* 545 F.2d 519, 523–24 (5th Cir.1977), for example, the court not only refused to instruct the jury that ignorance of the law negated specific

---

**1.** Section 841(a)(1) makes it unlawful to "knowingly or intentionally ... manufacture ... a controlled substance." The government does not dispute that specific intent is required for a § 841(a)(1) conviction.

**2.** Instruction #9A of the Fifth Circuit Pattern Jury Instructions.

intent, but also charged that "the presumption is that every person knows what the law forbids[.]" *See also United States v. Davis*, 583 F.2d 190, 193–94 (5th Cir.1978). In such cases, defense counsel would have no skeleton on which to structure their argument to the jury. *Compare United States v. Bush*, 599 F.2d 72, 76–78 (5th Cir.1979) *and United States v. Wellendorf*, 574 F.2d 1289, 1290–91 (5th Cir.1978) (jury charge was adequate to allow jury to find lack of specific intent, despite absence of specific charge on ignorance of law).

We have reversed convictions for failure to charge a jury on good faith with a reference to the general principle that "a defendant is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to the theory of his defense." *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir.1979), *quoting United States v. Wolfson*, 573 F.2d 216, 221 (5th Cir.1978); *see Coleman v. United States*, 167 F.2d 837 (5th Cir. 1948). In *United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir.1981), we held that the giving of a general instruction on specific intent did not "direct the jury's attention to the defense of good faith with sufficient specificity to avoid reversible error."

 We do not view our decision today as contradictory of this principle; the deeper question is how precise the instruction must be. As Judge Brown has stated,

> ... the instructions must be sufficiently precise and specific to enable the jury to recognize and understand the defense theory, test it against the evidence presented at trial, and then make a definitive decision whether, based on that evidence and in light of the defense theory, the defendant is guilty or not guilty.

*United States v. Barham*, 595 F.2d 231, 244 (5th Cir.1979). As in *Bush* and *Wellendorf*, the court's instruction on specific intent allowed the jury to weigh Fooladi's claim of good faith against the evidence it heard.

*Goss* and *Lewis* did not evaluate the jury charge or otherwise explain their rationale in the terms of *Barham*, but arguably instead laid down a *per se* rule that the failure to give an explicit instruction directly discussing good faith or ignorance of the law is always reversible error. To the extent *Goss* and *Lewis* embodied such a rule, they would be inconsistent with *Bush* and the earlier decided *Wellendorf* case. We prefer to read them in the reconciling light that neither *Goss* nor *Lewis* explained the shortcoming of the charge in the context of trial and closing argument, as we do today. Our review of the trial as a whole leads us to conclude that the court's charge here does not require reversal. This is the *Bush* and *Wellendorf* method. While we do not pretend that our decisional line has been straight, the seeming variation in principle is the anticipatable result of examining myriad fact patterns with a measure of whether an instruction was "sufficiently" precise. It is a construct fundamentally at odds with per se categorizations. Compare *Coleman v. United States*, 167 F.2d 837 (5th Cir.1948) and *United States v. Barham*, 595 F.2d 231, 244 (5th Cir.1979).

As a matter of superintendence we add a word of caution. That the pattern instruction given here will not necessarily be adequate in the face of specific requests in other cases is inherent in our reasoning. *Goss* is illustrative. It follows that the prudent course for the trial judge is to give such an instruction. Fooladi's conviction was saved by the circumstance that his case was fully developed and argued to the jury—ironically, because he was well defended.

We do not demean the role of pattern instructions, by reminding that, as with all such aids, pattern instruction cannot substitute for case-specific thought and adjustment. An elaborate additional instruction is not necessary. To the contrary, the addition of a simple sentence that the government was required to prove beyond a reasonable doubt that Fooladi knew that what he' was doing was unlawful, would have defused this serious appellate attack on the conviction. We add this caution because the trial judge's imprimatur on a defendant's theory is important. As the source of

the law and the only neutral figure before the jury, his words are potent. That reality drives the idea that a defensive theory is best *expressed by the judge.*

## II

Fooladi argues that a scientist engaging in legitimate research cannot be convicted under section 841(a)(1) and suggests that his research was analogous to the professional work of physicians and pharmacists.

In *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975), the Supreme Court held that Dr. Moore, whom the facts showed to be a "pusher," was not immune from prosecution under § 841(a)(1) simply because he was a doctor, but read the legislative history of the Controlled Dangerous Substances Act of 1969 to mean that

> the penalty to be imposed for a violation was intended to turn on whether the "transaction" falls within or without legitimate channels. All persons who engage in legitimate transactions must be registered and are subject to penalties under §§ 842 and 843 for "[m]ore or less technical violations." H.R.Rep. No. 91–1444, p. 10. But "severe criminal penalties" were imposed on those ... who sold drugs, not for legitimate purposes, but "primarily for the profits to be derived therefrom." *Ibid.*

423 U.S. at 135, 96 S.Ct. at 342.

In *United States v. Goldstein*, 695 F.2d 1228 (10th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983), and *United States v. Seelig*, 622 F.2d 207 (6th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980), *Moore* was read as exempting from § 841(a)(1) liability physicians and pharmacists who were selling drugs in violation of the Controlled Substances Act's technical requirements but not outside "legitimate distribution channels." We have, in dicta, agreed that medical professionals cannot be found guilty under § 841(a)(1) when acting in the "normal course of [their] profes-

sional activities." *United States v. Hayes*, 595 F.2d 258, 259 (5th Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 89 (1979). The argument is that the jury ought to have been instructed that it could find Fooladi guilty only if it determined that he was acting outside the normal scope of a professional researcher's conduct.[3]

■ No court has yet applied this reasoning to a non-medical professional like Fooladi. More significantly, if Fooladi's act is not punishable under § 841(a)(1), it is apparently not punishable under *any* section of the Controlled Substances Act. Section 842(a)(1), which the Court in *Moore* construed as meant "to reach those who should have registered but failed to do so," 423 U.S. at 134 n. 11, 96 S.Ct. at 341 n. 11, punishes only unlicensed distribution or dispensing of controlled substances, not their manufacture. The rest of §§ 842 and 843 punishes registrants who fail to perform various statutory duties. Section 841(a)(1) may be the exclusive way to deal with unregistered manufacturers and Congress presumably meant to halt their activities whether within or without "normal distribution channels." We reject Fooladi's argument.

## III

■ The evidence is sufficient to support the verdict. Fooladi admitted that he was making P–2–P and that he had been told that P–2–P was controlled. He claimed that he was planning to make amphetamines. His lab contained P–2–P, all the equipment necessary to make amphetamines, and formulas for doing so. Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), this evidence would allow a reasonable trier of fact to find beyond a reasonable doubt, *United States v. Fowler*, 735 F.2d 823, 826 (5th Cir.1984), that Fooladi intentionally manufactured a controlled substance, P–2–P, and had intended to and had taken substantial steps to manufacture ampheta-

---

**3.** Fooladi's counsel's third proposed jury instruction expressed this theory.

mines. *See United States v. Mandujano,* 499 F.2d 370 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

## IV

■ Fooladi asks this court to reassess its earlier decision that the warrant to search his residence was legal. This panel may only do so if the evidence has changed substantially, there is an intervening decision by controlling authority, or the panel decision was so erroneous that it caused manifest injustice. *See White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967); *Loumar, Inc. v. Smith,* 698 F.2d 759 (5th Cir. 1983). While the fullness of time, including a complete trial, has shown that not all the facts relied upon to support the probable cause behind the warrant were accurate, the magistrate's assessment of probable cause, viewed objectively at the time, remains valid.

■ Fooladi argues that the replacement of the *Aguilar/Spinelli* test for determining the validity for a search warrant with the totality-of-the-circumstances approach of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), is a change in the governing law that requires reconsideration of the panel decision. The panel weighed the totality of the circumstances surrounding the issuance of the warrant. *See Fooladi,* 703 F.2d at 184.

■ Finally, we see no reason to conclude that the panel's ruling was "manifest injustice."

## V

■ Fooladi argues that 21 U.S.C. § 811, the Code section that gave the Attorney General the power to classify P–2–P as a Schedule II substance, is an improper delegation of legislative power. We have held to the contrary in *United States v. Gordon,* 580 F.2d 827 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978).

AFFIRMED.