UNITED STATES of America,
Plaintiff-Appellee,

v.

Albert William GRAY, a/k/a A.W.
Gray, Defendant-Appellant.

No. 84–1298.

United States Court of Appeals,
Fifth Circuit.

Jan. 11, 1985.

Rehearing and Rehearing En Banc
Denied Feb. 5, 1985.

Donald R. Scoggins, Dallas, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., Fort Worth, Tex., William F. Alexander, Asst. U.S. Atty., Dallas, Tex., Janis Kockritz, Crim. Div., Appellate Sec., Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, WISDOM and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

After a jury trial, Albert William Gray was convicted of four counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of inducing travel in interstate commerce with the intent to defraud the traveller of property worth over $5,000, in violation of 18 U.S.C. § 2314. Gray offers three reasons for reversal: the trial court's refusal to give his requested jury instruction on good faith; rejection of his Fourth Amendment objections to the admission into evidence of a brochure that the receiver of Gray's defunct bonding company had turned over to the FBI; and the alleged insufficiency of the evidence. We affirm.

I

The indictment charged Gray with conducting a scheme to sell fraudulent surety bonds to contractors. Gray was accused of representing to contractors that his bonds had been issued by established insurance companies, when instead they were backed only by Gray's similarly-named Texas businesses.

In June of 1982, Gray incorporated a Texas corporation called New Hampshire Financial Services. Gray then filed assumed name certificates stating that New Hampshire Financial Services would do business under the names "New Hampshire Insurance Company" and "Granite State Insurance Company." Although Gray listed his true name and address in all of these filings, his selection of trade names showed little originality. New Hampshire Insurance Company is an established and prominent insurer with offices in Manchester, New Hampshire and Granite State Insurance Company is its subsidiary.

Gray promoted his companies as issuers of performance and payment bonds for contractors. He had a brochure printed describing each company's operations, financial status and officers. Much of the information in the brochure was false. Of the persons listed as officers, one was dead, two were attorneys with no connection to Gray's companies, and two were Gray's children, both under age 11. The brochure also listed over $800,000 in nonexistent corporate assets, and listed a nonexistent accounting firm as the corporate auditor.

In September 1982, Scott McPherson, an independent insurance agent, arranged for Gray's Granite State Insurance Co. to issue a performance bond for one of McPherson's clients. McPherson believed that he was dealing with the New Hampshire-based company. McPherson mailed Gray a premium check for $9,367.20. Gray then mailed McPherson a performance bond that bore two forged signatures and listed the company's home office as Manchester, New Hampshire.

In October 1982, Larry Snider, McPherson's partner, mailed Gray a premium check for $463.20. Gray mailed Snider a performance bond listing Associated Indemnity Company as the surety. Snider checked a U.S. Treasury Department list of insurers, saw Associated Indemnity listed as a division of Fireman's Fund, and assumed that the bond had come from the Fireman's Fund company. It was in reality backed only by Gray. The bond also contained the forged signature of a notary.

During the same month, for a $23,000 premium, Gray sold W.L. Kilgore a bond insuring Kilgore's performance as contractor on an Army Corps of Engineers dredging project in Louisiana. Kilgore's wife flew from New Orleans to Dallas, paid for and obtained the bond, and returned to New Orleans to submit the bond to the Corps for approval. The bond was issued by Gray's New Hampshire Insurance Co., but listed the company's home office as Manchester, New Hampshire; once again, the bond bore the forged signature of a purported corporate officer. The Corps later rejected the Gray bond, and demanded that Kilgore obtain a new one. When he

did not, the Corps cancelled Kilgore's contract and Kilgore filed for bankruptcy.

On October 14, a Texas court ordered Gray's business into a receivership. The State Board of Insurance was appointed as receiver. Christopher Meisel, the State Board official assigned to act as receiver, discovered the brochure. He questioned Gray, who admitted that many of the brochure's representations were false. Later, FBI Agent Sam Williams visited Meisel and told him that Gray was being investigated for possible criminal acts. Meisel agreed to cooperate with Williams, and turned over to him, among other items, the brochure.

Soon after the receivership took effect, Gray, using personal funds, refunded Snider's premium and other premiums paid to him for unused bonds. In the succeeding months, Gray wrote to the receiver and offered suggestions as to what actions New Hampshire Financial Services should take in the litigation over the Kilgore project.

Gray was indicted for mail fraud with respect to the McPherson and Snider bonds, and for causing Mrs. Kilgore to travel in interstate commerce with the intent to defraud her of over $5000. Before trial, Gray moved to suppress the brochure as the fruit of an illegal search; the court denied his motion without opinion. At trial, Gray, through cross-examination of government witnesses and exhibits submitted on cross-examination, introduced evidence of his post-receivership actions and of the truthfulness of his June 1982 state filings. The defense called no witnesses of its own.

At the close of the evidence, Gray's counsel submitted a proposed jury instruction setting forth good faith as a defense. The court refused to give this instruction, but instead charged the jury that specific intent was necessary for a conviction, and explained how Gray's intent might be inferred. Gray was convicted on all the counts submitted to the jury, and was sentenced to prison terms totalling seven years, followed by four years of probation.

II

–1–

■ We have recently explained that in deciding the sufficiency of the submission of a defendant's theory of defense the charge "... must be examined in the full context of trial including the final arguments of counsel." *United States v. Fooladi,* 746 F.2d 1027, 1030 (5th Cir.1984). That the inquiry is not confined to the four corners of the charge flows directly from the circumstance that the ultimate question is whether the claimed instructional deficiency "violates a defendant's right to the fair trial guaranteed him by the Due Process Clauses of the Fifth and Fourteenth Amendments...." *Id.* Any further narrowing of the judicial inquiry would then by necessity be justifiable only as a matter of superintendence. Arguably, we did just that in *United States v. Goss,* 650 F.2d 1336, 1344–45 (5th Cir.1981) and *United States v. Lewis,* 592 F.2d 1282, 1286–87 (5th Cir.1979). In *Goss* and *Lewis* the inquiry, although it is not certain, seems to have been confined to the charge. Whether this was simply reflective of the facts of those cases or whether it was a considered expression of a rule of superintendence was not clear. In *Fooladi,* we "read them in the reconciling light that neither *Goss* nor *Lewis* explained the shortcoming of the charge in the context of trial[.]" *United States v. Fooladi,* at 1031. We pointed out that reading *Lewis* and *Goss* as having adopted a per se rule, with its companion limit of looking solely to the charge, was inconsistent with earlier cases including *United States v. Wellendorf,* 574 F.2d 1289, 1290–91 (5th Cir.1978). Under our court rules any such inconsistency must be resolved in favor of the earlier line, absent intervening decisions by the Supreme Court. Arguably, the conflict among our prior decisions is illusory, a "seeming variation in principle ... the anticipatable result of examining myriad fact patterns with a measure of whether an instruction was 'sufficiently' precise." *Fooladi,* at 1031. In any event, we now lay uncertainty to

rest and make plain that any conflict among our prior decisions is resolved in favor of *United States v. Wellendorf,* 574 F.2d 1289 (5th Cir.1978); *United States v. Barham,* 595 F.2d 231, 244 (5th Cir.1979); *United States v. Fooladi,* 746 F.2d 1027 (5th Cir.1984); they are the law of the circuit.

–2–

Gray argues that the trial court erred in refusing his requested good-faith instruction. We must decide whether the charge that was given allowed Gray to develop and present to the jury his theory that he lacked the requisite intent to defraud his customers. As in *Fooladi,* we find that Gray had ample opportunity to present his defense and did so.

The evidence offered by the defense during the trial was explicitly submitted as proof of Gray's good faith. For example, when Gray's counsel moved for the admission of a document showing that Gray had refunded an unused bond premium, the prosecution objected on relevance grounds. Gray's counsel responded:

> Your Honor, I would offer Defendant's Exhibit No. 19 on the basis it is a valid defense to the charge of fraud to show good faith, and this assignment and refund shows good faith on the part of the defendant.

The court admitted the exhibit, and instructed the jury that:

> [The exhibit] has no bearing particularly on the indictment here as to the facts, but if you consider it for any reason you'll consider it for the sole and limited purpose as it relates to the intent of this defendant to commit the offenses charged....

The court's charge to the jury in no way undercut Gray's theory that he lacked fraudulent intent. To the contrary, it reinforced Gray's effort to express in terms of good faith his contention that he lacked the required intent. In relevant part, the charge read:

> The crimes charged in this case are serious crimes which require proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.... You may consider any statement made and done or omitted by the defendant, and all other facts or circumstances in evidence which indicate his or her state of mind.

This charge, as in *Fooladi,* was a springboard from which Gray's counsel was allowed to launch his good faith argument to the jury. The record shows that he did exactly that.

Gray's counsel introduced his argument by saying:

> [W]hat it will all boil [down] to is your determination of whether or not the government has proven to your satisfaction beyond a reasonable doubt that A.W. Gray intended to defraud somebody.

He then discussed at length the state filings, post-receivership letters, and refunds, twice explicitly referring to the issue at hand as one of good faith. In conclusion, counsel stated:

> [I]f there is any explanation, any reasonable explanation for the conduct of the defendant, other than his intent to defraud people, proven beyond a reasonable doubt, the law charges you to find him not guilty.

▇ Taken together, the trial, charge, and closing argument laid Gray's theory squarely before the jury. The court's charge enabled the jury to "recognize and understand the defense theory, test it against the evidence presented at trial, and then make a definitive decision whether, based on that evidence and in light of the defense theory, the defendant [was] guilty or not guilty." *Fooladi,* 746 F.2d at 1031,

*quoting United States v. Barham*, 595 F.2d 231, 244 (5th Cir.1979). The court's refusal to give the specific charge requested did not deny Gray a fair trial.

### III

Gray argues that FBI Agent Williams should have obtained a warrant before asking Meisel, the receiver, to turn over the brochure, and that the "seizure" of the brochure without a warrant invaded his Fourth Amendment rights. At the time of Williams's investigation, though, Gray no longer had custody or control over his companies' records, that authority having passed to the receiver. Because Gray no longer had a reasonable expectation that those records would remain private, he lacks standing to challenge the "seizure." *See United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Regardless, Williams did not "seize" the records, but made a request that Meisel agreed to. Williams obtained the brochure through the consent of its lawful custodian, Meisel, and thus did not violate the Fourth Amendment. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

### IV

Finally, Gray challenges the sufficiency of the government's case. The prosecution's evidence showed that Gray sent bonds containing falsehoods and forgeries through the mail, and that he prompted Mrs. Kilgore to travel from Louisiana to Texas to obtain a similarly misleading bond. This evidence, viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), is sufficient to allow a reasonable jury to find beyond a reasonable doubt that Gray intended to deceive the contractors he did business with.

AFFIRMED.